IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| MADELINE ROSARIO, et al. | : | NO. 16-148 |

MEMORANDUM

Bartle, J.                                            August 17, 2016

        The defendants Madeline Rosario ("Rosario") and

Maribel Nunez ("Nunez") have filed motions to suppress the

fruits of an April 16, 2016 search by federal agents of

582 Anchor Street in Philadelphia.  The search was conducted

pursuant to a search warrant signed by Magistrate Judge

Elizabeth T. Hey authorizing the government to locate and seize

documents, records, computers, storage media, routers, modems,

and network equipment.  The government's application for a

search warrant was accompanied by the affidavit of Special Agent

Denis Drum ("Special Agent Drum").

        On April 7, 2016, Rosario and Nunez were indicted by a

federal grand jury.  They were each charged with one count of

conspiracy in violation of 18 U.S.C. § 371 and one count of

theft of government property in violation of 18 U.S.C. § 641.

Rosario was also charged with one count of aggravated identity

theft in violation of 18 U.S.C. § 1028(A).  The government

alleges that Nunez and Rosario used business banking accounts at

Wells Fargo Bank to deposit fraudulently obtained U.S. Treasury
checks, state income tax refund checks, and third party refund
checks.

I.

In determining the validity of the search warrant, we
must review the facts set forth in the affidavit accompanying
the government's application for that warrant.  See United
States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993).  The
application contains the following facts.

Nunez and Rosario reside at the single-family
residence located at 582 Anchor Street.  Since at least 2009,
Nunez and Rosario operated businesses that cashed checks and
prepared state and federal income tax returns.  However, they
were not licensed as check cashers in Pennsylvania and their
businesses were not registered.  In operating those businesses,
the defendants opened at least five accounts at Wells Fargo
Bank.  Two bank accounts listed 582 Anchor Street in
Philadelphia, Pennsylvania as the account address.  One was
entitled "Sonia Serrano Multiservice" and the other was entitled
"Madeline Rosario, dba, Geraldino Services."  "Sonia Serrano
Multiservice" was opened in December 2010.  It originally
identified 178 Albanus Street in Philadelphia as its account
address but that account address was changed to 582 Anchor
Street in January 2011.  The resident of 178 Albanus Street told

-2-

investigators that she did not know Rosario or Nunez and that no business had operated at that address in the fourteen years that she had resided there.  "Madeline Rosario, dba, Geraldino Services" was opened in September 2013 using the 582 Anchor Street address.  The defendants' three other business bank accounts at Wells Fargo Bank used 6042 Castor Avenue, 920 Erie Avenue, and 2948 Tulip Street, respectively, as the account addresses.

The defendants deposited U.S. Treasury checks, state income tax refund checks, and other third party checks into the bank accounts.  The government alleges that dozens of checks totaling $439,843.69 were obtained by fraudulently filing income tax returns with the refunds then deposited into the accounts. Although licensed and registered check cashers often receive commercial checks, there were few to no commercial checks received by the bank accounts in issue.  Large cash and frequent personal debit card expenditures were made against the accounts. Contrary to Rosario's prior statement that she had charged customers a standard 2.5% fee for each check cashed, bank records demonstrate that Rosario and Nunez at times kept more than 30% of each check amount in fees.

A confidential witness ("CW"), who was previously employed as a customer service representative and bank teller at Wells Fargo Bank, admitted to opening bank accounts for the

-3-

defendants.   Along with Rosario and Nunez, CW also deposited checks into the accounts, wrote checks against the accounts, and made withdrawals from the accounts.   CW told Special Agent Drum that Rosario engaged in these activities at her 582 Anchor Street residence, an office at 6042 Castor Avenue in Philadelphia, and another location on Allegheny Avenue in Philadelphia.   In June 2011, CW was fired from Wells Fargo Bank.[1] CW pleaded guilty to one count of conspiracy in violation of 18 U.S.C. § 371, one count of theft of government property in violation of 18 U.S.C. § 641, and one count of aggravated identity theft in violation of 18 U.S.C. § 1028(A).

The affidavit of Agent Drum goes on to recite that the government interviewed Sonia Serrano under the terms of a proffer.   Although her name was associated with the "Sonia Serrano Multiservice Account," she stated that she was unaware that the account had been opened, did not recognize the signatures purporting to be her own on the documents, had no connection to the 178 Albanus Street address used to open the account, and only knew Rosario as an acquaintance.

---

1.   In June 2015, Rosario and Nunuz told CW that Rosario had been contacted by the FBI.   Rosario asked CW to tell the FBI that the money CW had received from Rosario for participating in the fraudulent check scheme was to repay a loan.   CW refused to lie.   Nunez told CW that she wished witchcraft on whoever sent the FBI to speak with Rosario.

The government also spoke with confidential informant JV. JV is currently married to Arleny Reyes Nunez although he has not resided with her for over three years. Arleny Reyes Nunez was previously married to Rosario's uncle. JV had visited 6042 Castor Avenue while the defendants used that location as an office. There, JV observed three computers, state checks, and U.S. Treasury checks on the desk. He rarely saw customers at that location and never saw customers seeking to cash checks. JV acknowledged that his signature was likely on three checks payable to him for $4,600, $4,500, and $4,014 but stated that he never received the full amount of those checks. He said that he did accompany Nunez to Wells Fargo Bank at least twice to cash checks and gave most of the cash to Nunez. He also admitted to collecting checks at various Philadelphia addresses on behalf of Rosario and Nunez. Those checks were addressed to people who did not live at the locations where the checks had been sent.

In April 2014, Rosario opened an account at Citizens Bank and provided 582 Anchor Street as the account address. That account remained open until at least July 2015. In June 2014, Rosario opened another Citizens Bank account using the address 709 East Allegheny Avenue. That account remained open until at least September 2015. A leasing agent acquired a listing for the property at 709 East Allegheny Avenue in the summer of 2015. In December 2015, federal agents conducted an

investigation at that address and found it to be vacant.
Nominal business records had been left in the building,
including a box of business cards in the name of one of the
businesses operated by the defendants.  There were also two
abandoned computers at that location.  The IRS searched those
computers and found very little information.  One computer
contained trace information regarding a tax return but there was
no specific information relating to four of the businesses
operated by Rosario and Nunez.

Federal agents also investigated 6042 Castor Avenue,
2948 Tulip Street, and 920 Erie Avenue.  These locations were
not under the control of Rosario and Nunez, and records could
not be obtained at those addresses.

In March 2016, JV told investigators that he had
observed at least two computers at 582 Anchor Street while
performing construction work.  One was in an upstairs bedroom
and another was in the basement.  The basement computer was
sitting on a desk.  JV also observed a large filing cabinet full
of papers.

Finally, Special Agent Drum stated in his affidavit
that based on his training and experience, it is common for
those engaged in check cashing, multiservice, or tax preparation
businesses to maintain records in their homes.  Those records
are ordinarily stored on electronic media and storage media.

-6-

II.

In reviewing a magistrate judge's decision to issue a search warrant, we must "determine whether 'the magistrate had a substantial basis for concluding that probable cause existed.'" See United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  This deference is not, however, a "rubber stamp."  See United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (quoting United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993)).  In deciding whether to issue a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  See New York v. P.J. Video, Inc., 475 U.S. 868, 876 (1986) (quoting Gates, 462 U.S. at 238).  "Probable cause is a 'fluid concept' that 'turn[s] on the assessment of probabilities in particular factual contexts.'"  Stearn, 597 F.3d at 554 (quoting Gates, 462 U.S. at 232).  We must "uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found."  See United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993).

Even if the search warrant was "issued by a detached and neutral magistrate but ultimately found to be unsupported by

-7-

probable cause," we will not suppress evidence obtained by an officer acting in objective good faith and within the scope of the warrant.  See United States v. Leon, 468 U.S. 897, 900, 920-21 (1984).  "[A] warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search."  Id. at 922 (internal quotation marks omitted).  "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate[ judge's] authorization.'"  United States v. Hodge, 246 F.3d 301, 307 (3d Cir. 2001) (quoting United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999)).  The suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority."  See id. (quoting United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993)).

## III.

Rosario and Nunez claim that the search warrant authorizing the search of their residence does not contain sufficiently particularized facts to support probable cause.[2]  In

---

2.  The defendants' motions for relief originally stated that "[i]nformation contained in the warrant is believed to be false and petitioner intends to cross-examine the affiant regarding prior informant information."  The court held telephone conferences with counsel for the government and counsel for the defendants Rosario and Nunez on June 28, 2016 and July 6, 2016,

this regard, they assert that the affidavit does not establish a link between 582 Anchor Street and the misconduct alleged in the indictment. They also argue that the application for a search warrant was insufficient to the extent that it relied upon evidence supplied by confidential informant JV. They maintain that the government has not established the reliability and veracity of JV.

We disagree. The magistrate judge had a substantial basis for concluding that probable cause existed to search 582 Anchor Street for computers, records, and other evidence of the alleged scheme to steal government property by filing false tax returns. See Stearn, 597 F.3d at 554. Even if the alleged fraudulently activity never took place at 582 Anchor Street, "[d]irect evidence linking the place to be searched to the crime is not required for the issuance of a search warrant." See Hodge, 246 F.3d at 305 (quoting Conley, 4 F.3d at 1207). Rather, the court "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." See Whitner, 219 F.3d at 296.

---

respectively. During those conferences, counsel for both Rosario and Nunez withdrew these assertions and indicated that the court should resolve the pending motions on the papers and without holding a hearing.

As set forth above, the affidavit accompanying the search warrant detailed the defendants' scheme to fraudulently obtain U.S. Treasury tax refund checks and other funds using several business bank accounts.  The defendants used the 582 Anchor Street address to open and maintain several of those accounts.  Further, CW informed agents that the defendants conducted business at 582 Anchor Street.  The defendants have not challenged the reliability or veracity of CW's statements. Before applying for the warrant to search 582 Anchor Street, agents searched various other locations associated with the scheme and found scant records of the defendants' check cashing operations.  In light of all of these circumstances, which were set forth in the affidavit, it was reasonable for the magistrate judge to determine that "there [wa]s a fair probability that contraband or evidence of a crime w[ould] be found" at 582 Anchor Street.  See P.J. Video, Inc., 475 U.S. at 876.

These circumstances supply probable cause to search 582 Anchor Street for evidence of the alleged criminal activity independent of the statements of informant JV.  However, JV's statements bolster the magistrate judge's decision to issue the search warrant.  JV told federal agents that he had observed a filing cabinet and two computers at the defendants' Anchor Street residence while performing construction work.  He also took part in the defendants' check cashing scheme by collecting

-10-

checks from various addresses and endorsing checks in exchange for a fraction of the checks' values.  JV's veracity and reliability are relevant factors but "these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case."  See Gates, 462 U.S. at 230.  "[A] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."  Id. at 233.  Independent police investigation that corroborates the informant's statements indicates that the informant's statements are reliable.  See id. at 241-42; Stearn, 597 F.3d at 556.

Finally, we note that the magistrate judge was a "detached and neutral magistrate" and that the officer who executed the search warrant did so in objective good faith and within the scope of the warrant.  See Leon, 468 U.S. at 900, 920-21; Hodge, 246 F.3d at 307.  The thirty-three page affidavit accompanying the search warrant application set forth the defendants' alleged illegal activity and supporting evidence in extensive detail.  It described the items to be seized and explained the agent's reasoning for believing those items could be located at 582 Anchor Street.  The officer who executed the warrant reasonably believed that this warrant was valid.

-11-

The lawful search of 582 Anchor Street was supported by probable cause, a valid search warrant, and the officer's good faith execution of that warrant.  Accordingly, we will deny the motions of defendants Madeline Rosario and Maribel Nunez to suppress the fruits of the April 16, 2016 search of 582 Anchor Street.